# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| Sonoran Technology and Professional Services, LLC | ) ASBCA Nos. 61040, 61101 |
| | ) |
| Under Contract No. FA3002-14-D-0005 | ) |

APPEARANCES FOR THE APPELLANT:    Brett W. Johnson, Esq.
    Colin P. Ahler, Esq.
    Sarah E. Delaney, Esq.
     Snell & Wilmer L.L.P.
     Phoenix, AZ

APPEARANCES FOR THE GOVERNMENT:    Jeffrey P. Hildebrant, Esq.
     Air Force Deputy Chief Trial Attorney
    Phillip E. Reiman, Esq.
    Lt Col Nathaniel H. Sears, USAF
    Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE NEWSOM

These appeals concern a claim for an equitable adjustment resulting from the government's incorporation of a wage determination into the contract. Appellant, Sonoran Technology and Professional Services, LLC (Sonoran), alleges that the wage determination increased Sonoran's state gross receipts tax liability, and argues that the contract requires the government to adjust the contract price to compensate Sonoran for this tax increase.

Both parties have elected to resolve these appeals on the written record without a hearing under Board Rule 11. In addition, because appellant is a small business concern and the amount in controversy is less than $150,000, Sonoran elected to proceed under the Board's expedited procedures in Rule 12.2.[1]

For the reasons explained below, we deny the appeals.

---

[1] Pursuant to Board Rule 12.2(d), a decision under Rule 12.2 shall have no value as precedent, and in the absence of fraud, shall be final and conclusive and may not be appealed or set aside.

## SUMMARY FINDINGS OF FACT

1. On 24 April 2014, the Air Force awarded Contract No. FA3002-14-D-0005 to Sonoran. The contract called for Sonoran to provide training and related services to F-16 air crews operating out of Luke Air Force Base (AFB), located in Arizona, and out of Holloman AFB, located in New Mexico. The contract services were to be performed under firm-fixed-price contract line item numbers (CLINs), although the contract included a few cost-reimbursement CLINs to pay for travel and supplies. The base contract included one 11-month period of performance followed by 4 option years. (R4, tab 2 at 2-42) The quantities were indefinite (*id.* at 62). The total estimated contract value at the time of award was $5,942,640.10 (*id.* at 1).

2. The solicitation that led to this contract award attached a Service Contract Act wage determination (SCA WD) and a Collective Bargaining Agreement (CBA). Section L.3.3.2.4 required that offerors provide a statement acknowledging, among other things, that "the prices proposed for labor covered by the SCA WD and CBA were formulated using the minimum wage and benefit rates specified in the document as required for covered contractor personnel"; and that "the wage and benefit rates specified in the SCA WD and CBA are not escalated beyond the basic period of performance." (Supp. R4, tab 26 at 95, tab 27, questions 95, 100, 109)

3. The contract incorporated, among other Federal Acquisition Regulation (FAR) clauses: FAR 52.222-41, SERVICE CONTRACT ACT OF 1965 (NOV 2007); FAR 52.222-43, FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT ACT – PRICE ADJUSTMENT (MULTIPLE YEAR AND OPTION CONTRACTS) (SEP 2009); FAR 52.229-3, FEDERAL, STATE, AND LOCAL TAXES (FEB 2013); and FAR 52.243-1, CHANGES – FIXED-PRICE (AUG 1987), ALTERNATE I (APR 1984) (R4, tab 2 at 58-59).

4. Of these clauses, three are particularly relevant to this dispute. First, FAR 52.222-41, SERVICE CONTRACT ACT OF 1965 (NOV 2007), provides in relevant part:

> (c) *Compensation.* (1) Each service employee employed in the performance of this contract by the Contractor or any subcontractor shall be paid not less than the minimum monetary wages and shall be furnished fringe benefits in accordance with the wages and fringe benefits determined by the Secretary of Labor, or authorized representative, as specified in any wage determination attached to this contract.

5. Second, FAR 52.222-43, FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT ACT – PRICE ADJUSTMENT (MULTIPLE YEAR AND OPTION CONTRACTS) (SEP 2009) (SCA Price Adjustment Clause), provides in relevant part:

2

(a) This clause applies to both contracts subject to area prevailing wage determinations and contracts subject to collective bargaining agreements.

....

(c) The wage determination, issued under the Service Contract Act of 1965, as amended, (41 U.S.C. 351, *et seq.*), by the Administrator, Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, current on the anniversary date of a multiple year contract or the beginning of each renewal option period, shall apply to this contract....

(d) The contract price, contract unit price labor rates, or fixed hourly labor rates will be adjusted to reflect the Contractor's actual increase or decrease in applicable wages and fringe benefits to the extent that the increase is made to comply with or the decrease is voluntarily made by the Contractor as a result of:

(1) The Department of Labor wage determination applicable on the anniversary date of the multiple year contract, or at the beginning of the renewal option period....

....

(e) Any adjustment will be limited to increases or decreases in wages and fringe benefits as described in paragraph (d) of this clause, and the accompanying increases or decreases in social security and unemployment taxes and workers' compensation insurance, but shall not otherwise include any amount for general and administrative costs, overhead, or profit.

6. Third, the contract incorporated the Changes clause at FAR 52.243-1, CHANGES – FIXED-PRICE (AUG 1987), ALTERNATE I (APR 1984). This clause provides in relevant part:

(a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any,

3

make changes within the general scope of this contract in any one or more of the following:

(1)    Drawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the Government in accordance with the drawings, designs, or specifications.

(2)    Method of shipment or packing.

(3)    Place of delivery.

(b)    If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.

....

*Alternate I* (APR 1984). If the requirement is for services, other than architect-engineer or other professional services, and no supplies are to be furnished, substitute the following paragraph (a) for paragraph (a) of the basic clause:

(a)    The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:

(1)    Description of services to be performed.

(2)    Time of performance (i.e., hours of the day, days of the week, etc.).

(3)    Place of performance of the services.

7. On 18 March 2015, Sonoran entered into a CBA with the International Association of Machinists and Aerospace Workers, AFL-CIO, and two local lodges

4

(collectively IAM)[2] (*id.* at 39). This CBA took effect on 1 May 2015 (*id.* at 38). The CBA established pay and benefits for certain labor categories that were higher than the previous wage determination and CBA (*id.* at 29).

8. On 23 April 2015, the Department of Labor issued Wage Determination No. CBA-2015-7628. Referring to the CBA between Sonoran and the IAM, the wage determination stated that "employees employed by the contractor(s) in performing services covered by the [CBA] are to be paid wage rates and fringe benefits set forth in the current [CBA]." (R4, tab 4 at 4) Through Modification No. P00003 dated 1 May 2015, the Air Force exercised the first option period and incorporated this wage determination for the first option period (*id.* at 1). Thus the new wage determination applied to the contract's option years. The modification directed the contract to submit "a request for equitable adjustment under FAR 52.222-43 FLSA and SCA price adjustment" (*id.*).

9. The state of New Mexico levies a tax on "any person engaging in business in New Mexico." This so-called "gross receipts tax" is calculated as a percentage of gross receipts. State law characterizes it as an excise tax. N.M. STAT. ANN. § 7-9-4 (1978). (App. supp. R4, tab 23)

10. Gina Saldivar, who was previously Sonoran's chief financial officer, now provides financial services as a consultant to Sonoran (app. supp. R4, tab 22, ¶ 2). She states that after Sonoran began performing the contract and the CBA and wage determination went into effect, Sonoran's revenues increased, and its New Mexico gross receipts tax liability increased proportionally (*id.* ¶ 9). She asserts that Sonoran's liability for New Mexico gross receipts taxes nearly doubled (*id.* ¶ 10). New Mexico subsequently increased the tax rate twice, further increasing Sonoran's tax liability (*id.* ¶ 11). Although Sonoran anticipated that these taxes would likely increase, the amounts of increase "could not be calculated at the time of Contract offer or award" (*id.* ¶ 13).

11. Sonoran submitted a request for equitable adjustment (REA) on 3 June 2015, in which it sought a price adjustment to compensate it for added costs incurred as a result of the CBA and wage determination (R4, tab 5). Sonoran initially requested three categories of costs: (1) compensation for the increase in direct labor costs for its non-exempt employees; (2) compensation for the increase in indirect labor costs for its exempt employees; and (3) compensation for the "financial effects of the New Mexico Gross Receipts Tax" (*id.* at 1).

12. On 18 September 2015, the government issued contract Modification No. P00006 incorporating the CBA into the contract (R4, tab 8).

---

[2] The government asserts that this CBA was signed on 29 May 2014 (gov't br. at 3), but this assertion is incorrect. The CBA plainly states that it was signed on 18 March 2015 (R4, tab 3 at 39).

13. On 25 September 2015, the government issued contract Modification No. P00007, increasing the contract price to compensate for Sonoran's higher direct labor costs (R4, tab 9). The modification did not include amounts for the increase in Sonoran's state gross receipts tax liability, nor amounts for indirect labor costs. In a subsequent letter dated 11 May 2016, the contracting officer explained that she concluded that the contract does not entitle Sonoran to compensation for these costs (R4, tab 10).

14. On 28 October 2016, Sonoran submitted a second, revised document, characterized as an REA. Sonoran dropped the request for indirect labor costs, but pursued a price adjustment for the gross receipts tax expense. It sought $66,579.49 for Option Years 1 and 2, arguing that this adjustment is required under the contract Changes clause. (R4, tab 11) This document did not include a request for a final decision, but did include the following certification signed by the Sonoran contracts administrator:

> I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am authorized to certify the claim on the behalf of the Contractor.

(R4, tab 13 at 1)

15. The contracting officer issued a written decision denying the 28 October 2016 REA on 4 January 2017. The decision does not contain standard language explaining the contractor's appeal rights. (R4, tab 17) The record does not reveal when the written decision was received by Sonoran.

16. Sonoran filed an appeal with this Board on 3 February 2017, characterizing the 28 October 2016 REA as a "Claim," and the contracting officer's 4 January 2017 as a denial of that claim (R4, tab 15). The appeal was docketed as ASBCA No. 61040.

17. In response to the Board's concerns about jurisdiction, Sonoran submitted to the contracting officer a claim dated 15 March 2017. It attached the 28 October 2016 REA (in which Sonoran requested an adjustment for its gross receipts tax expense), and requested a final decision on a price adjustment in the same amount as before, $66,579.49. (Supp. R4, tab 28) The contracting officer issued a final decision denying that claim on 22 March 2017 (supp. R4, tab 29). This letter contained a description of Sonoran's appeal rights (*id.* at 3).

18. The next day, on 23 March 2017, Sonoran filed an appeal from the 22 March 2017 final decision. This appeal was docketed as ASBCA No. 61101 and consolidated with ASBCA No. 61040.

6

DECISION

These appeals present the issue of whether a new wage determination incorporated into the contract triggered an obligation for the government to adjust the contract price so as to reimburse Sonoran for an increase in its state gross receipts taxes. Both appeals concern the same claim.[3]

Sonoran argues that two different contract clauses require the government to adjust the contract price so as to compensate it for these taxes: FAR 52.222-43, FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT ACT – PRICE ADJUSTMENT (MULTIPLE YEAR AND OPTION CONTRACTS) (SEP 2009) to which we refer as the SCA Price Adjustment clause, and the Changes clause, which in this contract was FAR 52.243-1, CHANGES – FIXED-PRICE (AUG 1987), ALTERNATE I (APR 1984).

For the reasons explained below, we hold that neither clause entitles Sonoran to recover its gross receipts tax expense.

Recovery Under the SCA Price Adjustment Clause

The SCA Price Adjustment clause and other related clauses implement the Service Contract Act, 41 U.S.C. § 351(a) (SCA). The SCA was designed to protect wages and fringe benefits of service workers employed on U.S. Government contracts. It directs the Department of Labor (DOL) to issue special minimum wage orders applicable to fixed-price services contracts, called "wage determinations." Through contract clauses, contractors are forbidden from paying less than the wages and fringe benefits contained in a wage determination. *See* 41 U.S.C. § 351(a)(1), (b). In this way, the SCA prevents contractors from underbidding competitors by cutting wages or fringe benefits to its service workers and thereby winning government contracts. *See Lear Siegler Services, Inc. v. Rumsfeld*, 457 F.2d 1262, 1266 (Fed. Cir. 2006); *Government Contracting Resources, Inc.*, ASBCA No. 59162, 15-1 BCA ¶ 35,916 at 175,575.

An SCA wage determination may be based upon a DOL determination of locally-prevailing wages and benefits, or it may be based upon wages and benefits in a collective bargaining agreement. 41 U.S.C. § 351(a)(2); 29 C.F.R. § 4.50 (2017) (explaining types of wage determinations). In these appeals, the wage determination was based upon a CBA negotiated between Sonoran and the IAM (finding 8).

---

[3] We have jurisdiction over the appeal docketed as ASBCA No. 61101 because it is a timely appeal from a final decision denying Sonoran's claim. The issues in both appeals are identical, so it is unnecessary to resolve the Board's jurisdiction to entertain ASBCA No. 61040.

If, after contract award, a new DOL wage determination may increase (or decrease) contractor costs, subsection (d) of the SCA Price Adjustment clause requires the government to adjust the contract price. The adjustment is supposed to cover the "actual increase or decrease in applicable wages and fringe benefits to the extent that the increase is made to comply with...[t]he Department of Labor wage determination applicable on the anniversary date of the multiple year contract, or at the beginning of the renewal option period." FAR 52.222-43(d)(1).

Subsection (e) defines the required price adjustment. It states:

> Any adjustment will be limited to increases or decreases in wages and fringe benefits as described in paragraph (d) of this clause, and the accompanying increases or decreases in social security and unemployment taxes and workers' compensation insurance, but shall not otherwise include any amount for general and administrative costs, overhead, or profit.

FAR 52.222-43(e). Thus, a price adjustment must include "increases or decreases in wages and fringe benefits" plus "the accompanying increases or decreases in social security and unemployment taxes and workers' compensation insurance." But the price adjustment shall not include "any amount for general and administrative costs, overhead, or profit." *Id.*

State gross receipts taxes are not expressly listed in this clause. They are not listed among the expenses for which a price adjustment must be made, nor are they listed among the exclusions from a price adjustment. Accordingly, the Board's task is to divine whether or not the clause was intended to require a price adjustment for a contractor's increase in state gross receipts tax.

We hold that under the circumstances of this appeal, the SCA Price Adjustment clause does not entitle Sonoran to a price adjustment that covers the contractor's increase in state gross receipts taxes. The Board so held in *All Star/SAB Pacific, J.V.*, ASBCA No. 50856, 98-2 BCA ¶ 29,958, *aff'd on recons.*, 99-1 BCA ¶ 30,214, which is directly on point. In *All Star*, the contractor sought recovery for its increased state excise tax as part of a price adjustment for a new SCA wage determination. 98-2 BCA ¶ 29,958 at 148,234. The Board held that the Price Adjustment clause did not entitle the contractor to a price adjustment for state excise tax expense, explaining:

> The clauses could not be more clear. They provide that any contract price adjustment for changes in mandated wage rates shall be limited to the changes in the wages, fringe benefits and accompanying changes in social security, unemployment taxes,

8

and workmen's compensation insurance and shall not include any additional amounts for G&A, overhead or profit on these costs.[4]

*Id.*

This analysis applies with equal force to the present appeals. Like the contractor in *All Star*, Sonoran seeks to recover state excise tax expense as part of a wage determination price adjustment. The SCA Price Adjustment clause is specific about what costs may be included in a price adjustment: wage and fringe benefit costs, plus accompanying social security, unemployment taxes, and workmen's compensation insurance costs. It mentions some taxes—social security and unemployment taxes—but not others. It specifies that these recoverable costs may not be burdened with overhead, G&A, or profit. The principle of construction, *expressio unius est exclusio alterius*, instructs that where one or more objects in a class are specifically named, we construe the contract to exclude an object of that class that is not named. *ITT Defense Communications Division*, ASBCA No. 44791, 98-1 BCA ¶ 29,590 at 146,703-04 (citing 3 *Corbin on Contracts* § 552 (1960); 17A C.J.S. *Contracts* § 312). Accordingly, state excise taxes are not to be part of an SCA price adjustment.

Sonoran makes several arguments in support of its claim. First, citing *Lear Siegler*, 457 F.3d at 1269 and *Gov't Contracting Resources*, 15-1 BCA ¶ 35,916 (*GCR*), Sonoran argues that the SCA Price Adjustment clause is "triggered by changes in a contractor's cost of compliance." Sonoran argues that gross receipts taxes are part of its cost of complying with the wage determination and CBA, therefore increases in such taxes must be part of any price adjustment. (App. br. at 5-7; app. resp. at 5)

---

[4] The Board in *All Star* considered different Price Adjustment clauses than that in the present contract, but the differences do not change the analysis. In *All Star*, the contract included the May 1989 version of FAR 52.222-43, in contrast to the September 2009 version in the present contract. Both versions contain identical language in paragraph (e) defining the scope of the price adjustment. *Compare* FAR 52.222-43(e) (SEP 2009) *with* FAR 52.222-43(e) (AUG 1989). The contract in *All Star* also included a Navy Marine Corps supplemental clause which provided in relevant part that "[a]ny such adjustments will be limited to increases or decreases in wages or fringe benefits as described above, and the concomitant increases or decreases in social security and unemployment taxes and workmen's compensation insurance, but shall not otherwise include any amount for general and administrative costs, overhead, or profits." NMCARS 5252.222-9303, PRICE ADJUSTMENTS IN THE OPTION YEARS FOR CHANGES IN WAGE DETERMINATIONS, (ALTERNATE II) (AUG 1991). 98-2 BCA ¶ 29,958 at 148,234. The *All Star* Board held this clause to have the same effect as FAR 52.222-43(e), and there is no reason currently to depart from that holding.

In both *Lear Siegler* and *GCR*, however, the contractor sought adjustments for increases in fringe benefits costs, not state taxes. In *Lear Siegler*, the contractor sought health plan cost increases, which was a fringe benefit under the CBA in that case. 457 F.3d at 1265. In *GCR*, the contractor sought severance pay costs, also a fringe benefit under the CBA in that case. 15-1 BCA ¶ 35,916 at 175,574. The SCA Price Adjustment clause expressly requires a price adjustment to cover fringe benefit costs. Both cases considered costs that are expressly recoverable under the SCA Price Adjustment clause, and neither considered whether state excise taxes are part of the costs for which an SCA price adjustment should be made. Accordingly, those cases do not compel a different holding than the Board reached in *All Star*.

Sonoran next argues that the "totality" of the clause reflects an intent "to provide an adjustment for any increase (or decrease) in taxes that accompanies an increase (or decrease) in wages and fringe benefits." Gross receipts taxes, it says, are the "type of costs that should be covered." (App. br. at 7) Otherwise, the purpose of the clause would be negated (app. resp. at 6).

This argument is unpersuasive. The clause's purpose is expressed in its text. We find no text evincing an intention to allow a price adjustment for generalized "type" of costs, nor for "any increase...in taxes." The *All Star* Board rejected this argument, noting that "[t]he wage rate adjustment clauses do not provide for the general allowability of excise taxes, or for taxes *similar in nature* to the taxes listed. Only social security and unemployment taxes are specifically listed as reimbursable." 99-1 BCA ¶ 30,214 at 149,480 (emphasis added).

Finally, Sonoran argues that it could not have priced the increase in its gross receipts taxes, because it did not know how much they would increase. It asserts that the solicitation required it to use labor rates in the previous CBA and did not allow contractors to "price contingencies into proposal when related to labor costs" (app. br. at 7-8; app. resp. at 2-4).

Sonoran overstates the solicitation's pricing requirement. It restricted escalation of "wage and benefit" rates, but did not prohibit pricing other contingencies. Moreover, the risk of a state tax increase in a fixed-price contract is generally born by the contractor. FAR 52.229-3, FEDERAL, STATE, AND LOCAL TAXES (FEB 2013) (finding 3).

Recovery Under the Changes Clause

Sonoran argues that the Changes clause, FAR 52.243-1, requires the government to pay an equitable adjustment for the costs incurred by the contractor—to include gross receipts tax expense—as a result of the incorporation of a new wage determination into the contract. Sonoran cites *Geronimo Service Co.*, ASBCA Nos. 14686, 14687, 70-2 BCA ¶ 8540 (1970), and *Lockheed Support Sys., Inc. v. United States*, 36 Fed. Cl. 424, 429 (1996), for the proposition that a revised wage

10

determination can constitute a change compensable under the Changes clause. (App. br. at 9; app. resp. at 6-9) In opposition, the government argues that the wage determination did not change the contract work so it is not compensable under the Changes clause (gov't resp. at 3-4).

Sonoran's arguments are unavailing. The Changes clause does not explain how to compute an equitable adjustment (finding 6). The SCA Price Adjustment clause does so, for labor rate adjustments required by an SCA wage determinations. Thus, even if the Changes clause entitled a contractor to an equitable adjustment for a revised wage determination, the calculation of that adjustment would be governed by the SCA Price Adjustment clause.

Were it otherwise, the clauses would be largely redundant, and portions would be superfluous. Both clauses would govern price adjustments triggered by a new wage determination, but each clause would entitle the contractor to different recoveries. That makes no sense. A contract must be construed as a whole and in a manner that gives meaning to all of its provisions and makes sense. *Bell/Heery, J.V. v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014); *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965).

The cases cited by Sonoran are not to the contrary. The contract in *Geronimo Service*, 70-2 BCA ¶ 8540, did not include the SCA Price Adjustment clause. In *Lockheed Support Sys.*, 36 Fed. Cl. at 429, the SCA Price Adjustment clause did not govern the adjustment sought by the contractor. Thus, unlike in the present appeals the SCA Price Adjustment clause was inapplicable to those appeals.

CONCLUSION

For the foregoing reasons, the appeals are denied.

Dated: 3 July 2017

ELIZABETH W. NEWSOM
Administrative Judge
Armed Services Board
of Contract Appeals

11

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61040, 61101, Appeals of Sonoran Technology and Professional Services, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
